Below is the Order of the Court.



_____
**Brian D. Lynch**
**U.S. Bankruptcy Judge**
(Dated as of Entered on Docket date above)

_____

# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF WASHINGTON AT TACOMA

| | |
|---|---|
| In re: <br><br> SCOTT T HUNTINGTON and ROCHELLE B MCGEE-HUNTINGTON, <br><br> Debtors. | Case No. 09-48196-BDL |
| LAURA HUNTINGTON, in her separate capacity and not on behalf of her marital community, <br><br> Plaintiff, <br><br> v. <br><br> SCOTT T HUNTINGTON and ROCHELLE B MCGEE-HUNTINGTON, husband and wife, and the marital community composed thereof, <br><br> Defendants. | Adversary No. 10-04331 <br><br> **AMENDED** OPINION <br><br> (amended to correct case number) |

Laura Huntington filed this adversary proceeding against Scott and Rochelle Huntington to render several alleged debts nondischargeable under 11 U.S.C. § 523(a)(2), (4) and (6). She also seeks to deny Scott and Rochelle their bankruptcy discharge under § 727(a)(3) and (4). The Court dismissed several of these claims before trial. *See* Docket Nos. 16, 61, and 62. Trial was held on June 27 and 28, 2012. All parties were represented by counsel.

The Court has considered the arguments of counsel, the exhibits and testimony, and the documents and pleadings on file. This opinion contains the Court's Findings of Fact and Conclusions

of Law for purpose of Federal Rule of Bankruptcy Procedure 7052. To the extent a Finding of Fact is a Conclusion of Law, or the converse, it is adopted as such. A separate judgment will be entered on the docket in accordance with Federal Rule of Bankruptcy Procedure 7058.

1. **Jurisdiction**

The Court has jurisdiction over this core proceeding under 28 U.S.C. § 157(b)(2)(I) and (J). Venue is proper under 28 U.S.C. § 1409(a).

2. **Facts**

   *a. The parties*

Plaintiff Laura Huntington is a sophisticated business woman with her own real estate consulting firm that provides investing advice to pension funds. She resides in Pierce County, Washington and is married to Douglas Huntington, with whom she has multiple separate property agreements. Laura filed this action in her own name. Defendants Scott and Rochelle Huntington were married at all times relevant to this proceeding. Scott is Doug's twin brother and former business partner. In this opinion, the Court refers to the parties by their first names or, when referencing all of them, "the Huntingtons."

   *b. The Huntingtons' business entities*

Beginning in 1994, Scott and Doug began to piece together a group of jointly owned and managed companies focused on real estate investment and management in the greater Tacoma region. The enterprise grew to encompass at least nine distinct business entities: Huntington Properties I, LLC; Huntington Properties II, LLC; Huntington Properties III, LLC; Red Oak, LLC; Silverton Group, LLC; Horizon Mortgage and Investment Company; Avista Escrow, LLC; MGM Property Management, LLC; and Central Office, LLC. The Court refers to the Huntington Properties LLCs by the terms "HPI," 'HPII" and "HPIII." These entities, as well as the Huntingtons' ownership interests therein, are described in more detail below.

Scott and Doug treated this enterprise as a single joint venture even though its functions and assets were spread among several companies. The Huntingtons held the bulk of their real estate

assets in their three holding companies – HPI, HPII and HPIII. MGM Property Management was the brothers' property management company and responsible for the upkeep, repair and maintenance of the properties held by HPI, II and III. Scott and Doug also worked as loan officers and controlling members of their mortgage brokerage firm, Horizon Mortgage. As Horizon officers, they generated mortgage loans to be brokered to lenders. Scott and Doug used their escrow company, Avista Escrow, to close the transactions. The majority of the brothers' business was conducted out of an office building owned by the Huntingtons at 15 Oregon Avenue in Tacoma. This office building was initially owned by HPIII, but at some point before 2008 it was transferred to Central Office, LLC. The business records of the various entities were stored at 15 Oregon Avenue and never moved.

Scott and Doug were responsible, to varying degrees and in varying roles, for the day-to-day operations and control of these entities. Scott's wife, Rochelle, owned membership interests in a few of the various LLCs but appears to have been a true passive investor with no involvement or control over business decisions. Laura was also a passive investor until late 2006 or early 2007, when she began to take a more involved role in Scott and Doug's business by lending money to Horizon Mortgage and by scrutinizing the brothers' business practices and transactions.

It is difficult to determine with precision who owns which company because the parties failed to provide the Court with operating or ownership agreements for all of the companies. In some cases, they provided tax documents that call into question whether the Huntingtons held their membership interests individually, or through pass-through entities. The Court is forced to rely upon the parties' oral testimony to establish ownership in some instances. In addition, Scott and Doug's ordinary course of business dealings involved the commingling of income, expenses, assets and liabilities among their companies, often without regard to corporate formalities, the operating agreements or tax reporting requirements. As best the Court can determine, the companies were owned and operated as follows.

    *i.    HPI, HPII and HPIII*

The Huntingtons held their real estate assets in HPI, HPII and HPIII. They created these entities in late 2001 to hold assets and provide them with a layer of personal liability protection.

HPI owned approximately twenty residential rental properties, which Scott and Rochelle had contributed to the company by quit claim deed on December 23, 2002. Scott was the managing member and tax matters partner of HPI. The testimony regarding the actual ownership of HPI was in conflict. No party placed the operating agreement into evidence. Scott testified that he and Rochelle were the 100% owners of HPI and they listed it on their bankruptcy schedules as their sole asset. Laura testified to holding a direct membership interest in HPI, but provided no evidence to support this claim apart from her self-serving testimony. And, in fact, one of Laura's own exhibits – an October 29, 2003 Common Ownership Agreement to which she is a party – lists HPI as being owned solely by Scott and Rochelle. As noted *infra*, when a motion to substantively consolidate HPI with Scott and Rochelle's bankruptcy was filed, Laura did not oppose the motion. To confuse matters, HPI did not issue tax forms to the Huntingtons, but rather to Silverton and Red Oak. Scott also testified that while he and Rochelle owned HPI, he considered HPI's rental properties to be owned 50-50 with his brother, Doug. Based on all the evidence, the Court finds that Laura did not hold any direct membership interest in HPI.

HPII owned commercial rental properties and Doug was its managing member. Laura provided uncontroverted testimony that she and Doug were the sole 100% owners of HPII, and the Huntingtons treated it as Doug and Laura's own separate property.

HPIII held other real estate investments that did not otherwise fit into HPI or HPII. Scott was its managing member and tax matters partner until his resignation on June 4, 2009 – whereupon Laura and Doug became the co-managing members. The HPIII operating agreement lists Doug, Laura, Scott and Rochelle as each having a 25 percent membership interest in the company. However, as with HPI, HPIII did not issue tax forms to the Huntingtons. Instead, it issued them to Red Oak and Silverton Group. The Huntingtons treated HPIII as being owned by all four of them.

        *ii.     Horizon Mortgage, Avista Escrow, MGM Property Management and Central Office LLC*

Horizon Mortgage was a mortgage brokerage firm owned 60 percent by Doug and 40 percent by Scott. Laura had no ownership interest in the company. Scott was Horizon loan officer and vice-president from 1994 through his resignation on September 9, 2009. Doug started at Horizon as a loan officer but accumulated more and more responsibilities and ended up running the day-to-day operations of the company.

Avista Escrow was an escrow company that carried out escrow and closing services for mortgage loans brokered by Scott and Doug in their capacity as Horizon loan officers. Scott and Doug owned 40 and 35 percent, respectively, of Avista. A third party named Lennie Mueller owned the remaining 25 percent and was responsible for the day-to-day operations of the company. Scott was named as the managing member until his resignation on September 22, 2009, but testified that he had never taken part in the operations, control, or management of Avista. Laura had no membership interest in Avista.

MGM Property Management was the brothers' property management company and was owned 50 percent by Red Oak and 50 percent by Silverton. Scott was the managing member of the company. MGM collected the rents, paid the bills, and repaired and maintained the residential and commercial properties owned by HPI, II and III.

Central Office, LLC was a holding company that owned the building at 15 Oregon Avenue in Tacoma, from which the Huntingtons conducted most of their real estate business. Horizon Mortgage, Avista, HPI and HPIII all had offices in the building at some point. Laura had an office in the building from which she conducted her separate pension fund consulting business. Scott testified that he and Doug each owned 50 percent of the company but, as with HPI and HPIII, Central Office issued K-1 tax forms to both Silverton and Red Oak.

    *iii.  Red Oak LLC and Silverton Group LLC*

Finally, each couple owned an "upsteam" limited liability company through which they paid taxes on the revenue generated by the overall enterprise. Scott and Rochelle each owned 50 percent of Silverton Group, for which Scott was the managing member. Doug and Laura each owned 50

percent of Red Oak, for which Doug was the managing member. Scott and Doug regarded Silverton and Red Oak as mere pass-through entities whose sole function was for tax reporting purposes..

   *c. Pre-bankruptcy events*

Scott and Doug have been investing and working together in the western Washington real estate market since at least 1994. The brothers regarded themselves as co-owners and co-managers of almost every bit of their real estate enterprise, with little regard for corporate formalities, reporting requirements or ownership agreements. As detailed below, it was routine for the brothers to commingle assets between their companies, or to pledge the asset of one company to secure the debt of another company.

By 2001, the Huntingtons began to consider ways of limiting their personal liability with respect to their real estate holdings. In furtherance of this goal, they formed HPI, HPII and HPIII on December 21, 2001 to hold their assets and to provide themselves with a liability shield. Red Oak and Silverton Group were formed the same month, which Scott and Doug used to purchase the company that would become MGM Property Management. The Huntingtons ultimately transferred their real estate holdings to HPI, HPII and HPIII. Scott testified that although he and Rochelle were the actual legal owners of HPI, he and Doug treated everything "50-50" and, in Scott's opinion, the brothers were the true beneficial owners of HPI and its assets. He further testified that he and Doug split the HPI revenue equally.

The brothers established an account dubbed "Huntington Properties" to deposit the rents from HPI, II and III, where they were commingled and used to pay for various expenses of the properties(such as mortgage payments, taxes and maintenance). These deposits were not earmarked for the company from which they originated, but were used to pay the expenses of all of the companies as they came due, without regard for corporate formalities or the separateness of the various legal entities.

Things began to go downhill in 2005. The Huntingtons' businesses began to lose money. Horizon Mortgage incurred over $1 million in unpaid federal payroll taxes, could not pay its own real

property taxes, and made no distributions to its owners. To make matters worse, Horizon generated pass-through income for Scott and Rochelle at this time despite its failure to make distributions, and they had to come up with $38,000 to pay the IRS. Scott and Doug strove to keep their businesses afloat. Scott deferred commissions from Horizon for writing and brokering mortgages and loaned Horizon money from his personal accounts. The brothers tried to sell or borrow against their companies' assets to keep things going but, on the whole, they continued to rack up debt because they lacked capital to cover operating expenses.

### i. *609 S. 34th Street*

By early 2007, things had gone from bad to much worse for Scott and Doug's real estate ventures. The brothers lacked capital to cover Horizon's operating expenses and together approached a hard money lender named Arlington Financial in February 2007 to secure additional funds to keep Horizon running. Arlington was willing to lend only if Horizon could offer collateral to secure the loan but Horizon lacked any assets to offer as security. Scott and Doug discussed the matter and determined that HPI would grant Arlington a deed of trust against one of its own assets at 609 S. 34th Street, Tacoma in order to secure $60,000 in financing for the benefit of Horizon and all the companies.

What happened next is disputed. Arlington ended up with a promissory note and deed of trust against the HPI asset. The note was signed and guaranteed by all four Huntingtons; HPI ended up with $60,000 in cash. Although her signature appears on the promissory note and guaranty, Laura testified she did not sign the deal, and she contends her signature is a forgery. There is, however, no evidence that either Scott or Rochelle forged Laura's signature. The $60,000 in new money was put back into the businesses to pay for ordinary expenses and costs of running the companies. Arlington eventually foreclosed on the property and sued the Huntingtons on their guarantees, which resulted in Laura paying $20,000 to settle Arlington's claim against her.

### ii. *South Union Avenue Properties*

By April 2007, within two months after using up the Arlington Financial money, the Huntingtons needed even more money to keep the businesses running. Laura had become more involved in the situation by this point, including loaning Horizon $30,000 to help cover its payroll. Scott and Doug discussed the matter and decided to obtain cash by refinancing three apartment complexes owned by HPIII – 4525, 4529 and 4535 South Union Avenue, Tacoma. Laura was not consulted about the proposed refinance.

The problem with the plan was that the bank would not refinance the properties unless and until they were titled in the name of an individual, rather than in the name of HPIII. Thus, on April 16, 2007, in his capacity as HPIII managing member, Scott executed quit claim deeds transferring title to the Union Avenue Properties from HPIII and into the name of Scott and Rochelle Huntington. He then refinanced the properties and received a $65,015.99 wire transfer into his personal bank account. Scott testified that Doug agreed to this transaction.

Scott has not accounted for how this money was spent, but points to the fact that in the months following his receipt of the money he made multiple, substantial payments to Horizon Mortgage and the Huntington Properties general account, purportedly for the benefit of all of the companies. He claims to have spent the money on the business rather than himself, but provided no records to back up this claim. In addition, although Scott transferred the Union Avenue Properties into his and his wife's name in 2007, they continued to be listed on HPIII's 2008 federal income tax return. Laura argues this misreporting caused her to incur unjustified tax liability with respect to HPIII, but she provided no evidence at trial to support her claim of a heightened tax burden.

    *iv.  The sales of 5643 S. Birmingham St. and 4321 S. K St.*

By early 2008, the Huntingtons' real estate business was still floundering and Scott and Doug remained short on cash. At trial, Laura pointed to two transactions around this period that she claims give rise to nondischargeable debts under Section 523(a)(4) and (6): the sale of 5643 South Birmingham Street and the sale of 4321 South K Street.

Both South Birmingham and South K Street were encumbered HPI assets that Scott, in his role as managing member of HPI and with Doug's advice and consent, sold to obtain cash to fund and unburden the overall enterprise. Laura was not aware of and did not approve of either transaction.

The South Birmingham sale closed through Avista Escrow on March 31, 2008. There are two different settlement statements for this sale, with different numbers, and Scott testified that the settlement statement contained in Plaintiff's Exhibit P4 is not accurate. It is difficult to decipher from the documents and Scott's testimony where the money went. It appears from Plaintiff's Exhibit P2 that there were two mortgages against the property, but Scott testified that the first mortgage was not paid off with the sales proceeds. Instead, the sales proceeds were diverted to other personal and business expenses of the Huntingtons and their various entities, and Scott testified that Doug was aware of this situation. The funds disbursed included $5,000 to Doug and Laura's personal real estate agent Jeff Von Schmauder for an unrelated personal transaction, $10,580.63 to the general Huntington Properties account, and $79,467.97 to Avista Escrow. HPI continued to pay the first mortgage through August 2009, although it should have been paid off at closing. Although Laura introduced into evidence a single ledger balance report that purports to show Scott and Rochelle received two $5,000 checks and a $10,000 wire transfer on account of this transaction, those transfers were made before the sale of the South Birmingham property and appear unrelated to the sale. Laura hinted at trial that the $79,000 transfer to Avista was improper for some unspecified reason but failed to provide any evidence in support of that argument, despite having full access to Avista's corporate records and escrow files.

The South K Street transaction closed on April 11, 2008 and resulted in the deposit of $213,921.08 into the Huntington Properties general account. As with the South Birmingham transaction, the money was then disbursed to various personal and business expenses of the Huntingtons, rather than being used to pay the existing first lienholder on the property, Homecomings Financial Ltd. $94,997.53 was sent to the Pierce County Assessor Treasurer to pay delinquent property taxes on the Central Office Building to stop a tax foreclosure, because Scott and Doug hoped

9
Case 10-04331-BDL    Doc 70    Filed 08/06/12    Ent. 08/06/12 14:34:07    Pg. 9 of 20

to ensure that a then-pending sale of the building could close and free up much-needed liquidity for the rest of the businesses. In addition, Doug and Laura's real estate agent Von Schmauder was paid $20,200 for a personal real estate transaction not related to HPI; $21,300 was disbursed to Larry Burr to repay him for loans to the businesses; $2,500 each was disbursed to Scott and Doug for real estate commissions; $7,764.83 went to real property taxes on a parcel in King County owned by HPII, Doug and Laura's entity; and $9,258 was disbursed to the Huntington Properties account. Although the records show Laura was issued a $10,500 check out of the proceeds of sale, that check was later canceled for insufficient remaining funds. The only money taken by Scott from this transaction was a $2,500 real estate commission and the evidence shows that the proceeds were diverted from their intended use – to pay off the existing lender on South K Street – and used instead to pay a variety of the Huntingtons' businesses and personal expenses.

        v.    *Other miscellaneous allegations regarding nondischargeability*

In addition to the foregoing, Laura challenges other conduct that she claims gives rise to nondischargeable 523 debts, including: (1) Scott's alleged failure to account for $50,000 loaned to complete a short plat on an HPIII asset in Kelso, WA; (2) Scott's transferring of HPI and HPIII assets that allegedly created an unjustified tax liability for Laura; and (3) the execution of a $500,000 note and deed of trust to secure a loan from Viking Bank to HPIII which Laura contends contain her forged signature, was allegedly used for improper purposes, and was not paid off in accordance with other loan agreements.

        A.  *The Kelso short plat*

The short plat transaction involved a $50,000 loan from Sound Banking Company to HPIII to short plat the three parcels at 800-806 Kiltie Place in Kelso, Washington. All four Huntingtons signed the promissory note and provided personal guarantees on the loan, but the short plat was never completed. Laura does not dispute that she signed the Kiltie Place note and deed of trust. Doug and Laura now own the property, which is underwater, and Laura claims to have been damaged by Scott's failure to complete the short plat. She argues the $50,000 loan proceeds simply disappeared without

any accounting and that no lender will touch the project. However, Scott testified that the $50,000 was in fact spent on the short plat and work related thereto and it was never completed because the Huntingtons ran out of money. He provided details of his negotiations with the city, the acquisitions of bids, the purchase of pipe and fire hydrants and, importantly, how the construction work was begun but never finished for lack of funds. Laura failed to prove that Scott diverted the loan proceeds for an improper purpose.

### *B. Laura's allegedly enhanced tax liability*

With regard to Laura's alleged tax liabilities as a result of Scott's transferring of HPI and HPIII assets, Laura testified that she had overpaid the IRS about $99,000 from 2001 to 2010. But she provided no documentation to support this claim – no tax returns, no accounting, no expert analysis of her tax filings, or anything else. Her only evidence was oral testimony to the effect that she had looked over the numbers with her accountant and determined that she had overpaid by $99,000. She did not offer her accountant's analysis into evidence. The evidence is insufficient to establish that there was a breach of fiduciary duty by Scott that caused Laura an enhanced tax liability.

### *C. Alleged Forgery and Misapplication of Viking Bank Loan Funds*

The Court finds it difficult to discern the precise nature of the allegations relating to the $500,000 Viking Bank loan to HPIII. Laura alleges in her trial brief that the loan named HPIII as the borrower, but that HPI was "the beneficiary of the capital through the acquisition of assets, thereby making [her] as a member of [HPIII] a borrower on debt for assets which had been titled in [Scott and Rochelle's] name personally." Laura claimed at trial that her signature was forged on the loan documents. She also claimed the loan proceeds were misapplied. However, she admits that she signed the closing documents, which directed that the loan proceeds go to pay (1) unsecured debts of Scott and Doug's unsecured debts to Viking, (2) a second loan for which HPIII was the borrower, and (3) the Central Office Building loan. There is no evidence that Scott or Rochelle forged Laura's signature in connection with this loan, and Laura failed to submit any documentary evidence to substantiate her claim of misapplication of the sale proceeds from the sale of the Skyline and

Normandy Park properties. The Court finds that there was no forgery by Scott or Rochelle, and no proof that the sale's proceeds were improperly applied.

### D. Scott's alleged failure to preserve books and records.

By 2009 the economy was in the midst of a severe downturn and the Huntingtons' real estate business was in crisis. On June 4, 2009, Laura's attorney sent Scott a letter stating Laura's belief that Scott had mismanaged HPIII, breached his fiduciary duties to the other HPIII members and failed to account for the use of funds. The letter gave Scott a choice: either produce all of HPIII's records and lists of its financial obligations and transaction history, or resign as managing member. Scott resigned and, on June 4, 2009, consented to the appointment of Doug and Laura as co-managing members of HPIII. The letter did not mention HPI or state that Laura was dissatisfied with Scott's management of HPI, even though she claims to have a personal interest in that company.

Upon his resignation from HPIII, Scott left the company's corporate records in a file cabinet next to Doug's office at 15 Oregon Avenue, the office building used by himself, Doug and Laura for many of their joint and separate businesses. He testified that he did not take any documents with him, nor did he attempt to destroy or conceal any of the records. Instead, he left the HPIII business records in the care of Doug – his brother and joint venture partner. Furthermore, as the newly minted co-managing member of HPIII, Laura had access to the corporate records and Scott's computer. Laura testified on multiple occasions that she had full access to the HPIII files and Scott's computer as late as March of 2012. In fact, she was able to locate and produce for trial a great volume of corporate records, bank statements, settlement statements, ledgers and other financial data in support of her claimed damages. She acquired this information either from the files on site at 15 Oregon Avenue, from the Huntingtons' controller, or from Doug himself.

On June 5, 2009, the day after his resignation from HPIII, Scott went into his former office and forwarded several hundred emails from his work email to his personal email address. There is no evidence that he deleted any emails or attempted to otherwise conceal or hide any electronic information, files or emails.

Scott went on to resign as managing member of Avista Escrow on September 22, 2009. He left the business records at the central office building in the care of Doug and Lennie Mueller, his co-members of Avista Escrow. Laura had, and has, access to these Avista records. She claimed at trial to be unable to locate four alleged Avista refinance files from 2006, but also admitted that she had not searched through all the files at 15 Oregon Avenue. She further testified that the files were not well organized and that she has spent the better part of two and a half years trying to reconstruct the affairs of HPIII and the other Huntington entities.

    *d. Post-bankruptcy events*

Scott and Rochelle filed for Chapter 7 bankruptcy protection on October 30, 2009 and listed HPI as their sole asset. The Chapter 7 trustee moved to substantively consolidate HPI into Scott and Rochelle's bankruptcy estate on September 27, 2010. Laura argues this gives rise to a nondischargeable debt because Scott and Rochelle's allegedly fraudulent misrepresentations about who owned HPI led directly to the Trustee's consolidation of HPI into their bankruptcy estate and, thus, deprived her of her interest in HPI and its assets. The Court takes judicial notice of the Certificate of Notice and Declaration of No Objection, Docket Nos. 114 and 119, Case No. 09-48196, which shows that Laura was served with the Trustee's motion and did not object. Fed. R. E. 201(c).

Finally, Laura contends that Scott's concealment or destruction of records is evidenced by his failure to produce HPI and HPIII settlement statements in response to discovery requests.

**3. Conclusions of Law**

The Court concludes that Laura's claims must all be dismissed, with the exception of a $16,254 nondischargeable debt under § 523(a)(4) on account of Scott's defalcation in the Union Avenue Properties transaction.

    *a. Laura's claims against Rochelle Huntington are dismissed*

There is no evidence at all that Rochelle participated in any of Scott's business decisions or transactions. She was involved only by virtue of her ownership interests in HPI, HPIII, and Silverton Group. She had no role in the day-to-day operations of Scott and Doug's business enterprise, financial

dealings or record-keeping. She was a true innocent spouse and all claims against her are hereby DISMISSED.

*b. Laura's § 523(a)(2)(A) claim against Scott is dismissed*

Section 523(a)(2)(A) excepts from discharge liabilities for money, property or services, or an extension or refinancing of credit to the extent obtained by false pretenses, false representations or actual fraud. To sustain a claim under § 523(a)(2)(A), the false representations giving rise to the debt must have been knowingly and fraudulently made. *See Century 21 Balfour Real Estate (In re Menna)*, 16 F.3d 7 (1st Cir. 1994). The other party must have justifiably relied on the representation. *Field v. Mans*, 516 U.S. 59 (1995).

To sustain a prima facie case of fraud, a plaintiff must show that: (1) the debtor made the representation; (2) at the time of the representation, the debtor knew it to be false; (3) the debtor made the representation with the intent and purpose of deceiving the plaintiff; (4) the plaintiff justifiably relied on the representation; and (5) the plaintiff's loss was proximately caused by the representation. *In re Ophaug*, 827 F.2d 340 (8th Cir. 1987).

The central problem with Laura's § 523(a)(2)(A) claim is that she does not identify specific fraudulent representations or omissions giving rise to nondischargeable debts. Instead, she points to the entirety of his conduct, throws her hands up, and argues that "these and other acts prior to the case were and are in violation of section 523(a)(2)." Adversary Complaint, Docket No. 1, Page 9, Lines 27-28. This is insufficient to sustain a claim of nondischargeability. Laura did not produce evidence that Scott knew any of his representations were untrue, or that he made such representations with the intent to deceive Laura. She did not produce evidence that she relied on any of Scott's alleged misrepresentations and, indeed, claims to have been ignorant of the transactions at the time.

To be clear, there is no doubt that Scott defrauded the first mortgage holders on the South Birmingham and South K Street properties when he failed to pay the first mortgages and instead used the sale proceeds for the Huntingtons' personal and business expenses. However, Laura was not the victim of this fraud; the lenders and buyers of the two properties are the aggrieved parties. While Laura

may feel cheated that none of the money went to her, she has no claim to the tainted funds and, in fact, she and her companies received several direct and indirect benefits from the sales proceeds. In addition, Laura is not an aggrieved party because she lacks a direct ownership interest in HPI and would not be entitled to that money in her personal capacity in any event.

Moreover, to the extent her 523(a)(2) claim is based upon allegedly forged signatures, there is no evidence Scott was responsible for any forgery. Put simply, Laura has not made out a case for fraud under 523(a)(2)(A) and her claim under this subsection is hereby DISMISSED.

*c. Scott owes Laura a $16,254 nondischargeable debt under § 523(a)(4)*

Section 523(a)(4) excepts from discharge a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny." Under this section, "fraud" has been interpreted to mean intentional deceit, rather than implied or constructive fraud. *In re Tripp*, 189 B.R. 29 (Bankr. S.D.N.Y. 1995). "Defalcation" refers to the failure of a fiduciary to account for funds and, in the Ninth Circuit, an innocent mistake that results in the failure to account for funds handled in a fiduciary capacity can sustain an action for defalcation. *Lewis v. Scott (In re Lewis)*, 97 F.3d 1182 (9th Cir. 1996). "Embezzlement" is defined as the "fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." *Transamerica Commercial Fin. Corp. v. Littleton (In re Littleton)*, 942 F.2d 551, 555 (9th Cir. 1991).

Here, Scott was a fiduciary with respect to HPI and HPIII because he was the managing member of those companies. Under Washington law, "the role of members in a member-managed LLC is analogous to that of partners in a general partnership, and partners are held accountable to each other and the partnership as fiduciaries." *Bishop of Victoria Corp. Sole v. Corporate Business Park, LLC*, 138 Wash. App. 443, 456 (2007).

Laura alleges Scott committed fraud and defalcation in his fiduciary capacity, as well as embezzlement, by: (1) commingling the funds and assets of HPI and HPIII and treating them as one entity; (2) selling, refinancing or transferring HPI and HPIII assets without notice to Laura and disbursing the proceeds into his personal accounts; (3) obtaining loans or refinancings of HPI and

HPIII assets through the use of Laura's forged signature on loan documents; (4) causing Laura to incur unwarranted tax liability with respect to HPI and HPIII; (5) failing to account for $50,000 in short plat loan proceeds; and, perhaps (6) claiming HPI as his and Rochelle's sole asset on his bankruptcy schedules.

The Court concludes these claims are not well-founded, with the exception of Scott's defalcation of the proceeds of the Union Avenue Properties refinancing. The fact that Scott commingled the assets and liabilities of HPI and HPIII does not, by itself, give rise to a § 523(a)(4) debt – Laura bears the burden of pointing to specific transactions that harmed her. She has identified three separate transactions in which Scott allegedly took the proceeds for himself or used them for an improper purpose: the Union Avenue Properties refinancing, the South Birmingham transaction, and the South K Street transaction.

The Court concludes that Scott committed a defalcation with respect to the $65,015.99 in proceeds from the Union Avenue Properties refinancing because he transferred title to himself and his wife without obtaining Laura's consent to the transaction. The money was wired into Scott's personal bank account and, despite his claim that the money was for repayment of loans to the companies, he has failed to adequately account for where it went. Since Laura holds 25 percent of the HPIII membership interests, she was entitled to one-fourth of this money. Accordingly, it is hereby ADJUDGED, ORDERED and DECREED that Scott Huntington owes Laura Huntington a $16,254 nondischargeable debt under § 523(a)(4).

Regarding the South Birmingham and South K Street sales, the victim of Scott's malfeasance is not Laura – it is the unpaid lenders and purchasers of the properties. As noted above, the money was diverted from paying off the first mortgages on the properties to a variety of the Huntingtons' personal and business liabilities, including Laura's personal debts. In addition, Laura failed to establish that she was a member of HPI, a prerequisite to asserting a § 523(a)(4) claim with respect to these transactions. Finally, Laura failed to show that Scott intended to deceive her, a necessary element to sustain a claim for fraud under § 523(a)(4).

Regarding the other claims, first, there is no evidence that Scott forged Laura's signature on any of the loan documents. Second, Laura failed to meet her burden of proof to support her claim of an increased tax burden. Third, Scott provided uncontroverted testimony that the $50,000 was in fact spent on the short plat of the Kiltie Place units. These transactions cannot form the basis for a § 523(a)(4) claim.

Finally, Scott did not violate § 523(a)(4) by listing HPI as his and Rochelle's sole asset because there is no evidence that Laura was in fact hurt by this action. First, the Court is unclear as to how substantive consolidation of HPI into Scott and Rochelle's estate deprived Laura of any property interest. She has not shown that she has been prejudiced by substantive consolidation. *See, e.g.*, *In re S & G Financial Services of South Florida, Inc.*, 451 B.R. 573 (Bankr. S.D. Fla. 2011) (once proponent of substantive consolidation makes a *prima facie* showing therefore, the burden shifts to an objecting party to show (1) it has relied on the separate credit of one of the entities and (2) that it will be prejudiced by substantive consolidation). By analogy, in the nondischargeability context, Laura must show that substantive consolidation of HPI has harmed her in some way, and this she has failed to do. Second, Laura was served with the Trustee's consolidation motion in Scott and Rochelle's case and did not object at that time. She has therefore waived the right to challenge that action or wield it as a sword against Scott in this adversary proceeding. Third, Laura has failed to show that she is a member of HPI, such that she could make a legitimate claim to its assets.

Accordingly, Scott is only liable to Laura under § 523(a)(4) for his defalcation of the $65,015.99 in proceeds from the Union Avenue Properties refinancing, of which Laura's share is $16,254. All other claims under § 523(a)(4) are hereby DISMISSED.

*d. Laura's § 523(a)(6) claim against Scott is dismissed*

Section 523(a)(6) excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." Section 523(a)(6) generally relates to torts and not to contracts. *Lockerby v. Sierra*, 535 F.3d 1038 (9th Cir. 2008). Most courts have held that a wrongful act done intentionally and without just cause or excuse, which necessarily produces harm or

17
Case 10-04331-BDL    Doc 70    Filed 08/06/12    Ent. 08/06/12 14:34:07    Pg. 17 of 20

has a substantial certainty of causing harm, is sanctionable within the meaning of the subsection. *See Printy v. Dean Witter Reynolds, Inc.*, 110 F.3d 853 (1st Cir. 1997) (collecting cases).

The conduct at issue in this case does not come within the ambit of § 523(a)(6) because there is no evidence that Scott had a subjective motive to inflict any injury on Laura, or that he believed injury was substantially certain to occur as a result of his conduct. *See Petralia v. Jercich (In re Jercich)*, 238 F.3d 1202, 1208 (9th Cir. 2001) (discussing the willful injury requirement). The evidence instead shows that Scott's commingling of funds, transferring of assets, loans and repayments and overall course of conduct was intended to save the Huntingtons' real estate business. He did not intend to harm Laura, nor did he believe that his conduct was substantially certain to injure her. Any alleged injury to Laura was not "willful" within the meaning of the Bankruptcy Code and Laura's claim against Scott under § 523(a)(6) is therefore DISMISSED.

*e. Laura's § 727(a)(3) claim against Scott is dismissed*

A debtor will be denied a bankruptcy discharge under § 727(a)(3) if he fails to keep or preserve books and records, unless the act or failure to act was justified under the circumstances of the case. The records need not be kept in any particular form and the test is whether "there is available written evidence made and preserved from which the present financial condition of the bankrupt, and his business transactions for a reasonable period in the past may be ascertained." *Meridian Bank v. Alten*, 958 F.2d 1226, 1230 (3d Cir. 1992) (citation omitted); *see also Noroian v. Hern*, 422 F.2d 1092, 1094 (9th Cir. 1970) ("All that is required is that a competent accountant should be able to determine from such books and records the financial condition of the bankrupt."). Once a creditor shows the debtor has failed to keep adequate records, the burden shifts to the debtor to justify his actions or failure to act. *Id.*

Laura's § 727(a)(3) claim revolves around the following allegations: (1) that Scott forwarded and sought to delete HPIII emails upon his resignation from the company; (2) that he failed to preserve the records of HPI and HPIII or produce them in discovery; and (3) general allegations that his business practice of commingling funds and assets amongst the business entities makes it impossible

to trace or recreate his finances. The Court concludes that Laura has failed to make a *prima facie* case that Scott failed to keep adequate records, and that Scott's actions were proper and justified under the circumstances of this case.

This conclusion stems from the fact that Scott, or the bookkeeping agent for the enterprises of which he was a managing member or officer, in fact maintained extensive records for the Huntingtons' business entities. The books and records were kept in the central file storage area at the office building at 15 Oregon Avenue and there is no evidence that Scott ever moved, destroyed, altered or concealed them from his creditors. Scott provided uncontroverted testimony that upon his resignation from HPIII he left the records in the file storage area in Doug's care. Laura admitted that she had, and continues to have, access to these records. In fact, she was able to produce detailed financial records, canceled checks, settlement statements and single ledger balance reports in support of her case. As for the emails Scott forwarded to his personal email account, they remained on the HPIII file server and Scott made no attempt to delete or conceal them. The Court concludes it was proper for Scott to leave the business records in the care of Doug, his brother and business partner, because Doug was also responsible for the day-to-day operations of the businesses. His failure to produce HPI or HPIII settlement statements in discovery is justified because he did not have personal copies of such records.

Laura argues the records are disorganized and complex and that it has taken her much time and effort to reconstruct Scott's financial history. While debtors have "the duty to maintain and retain comprehensible records," and "creditors are not required to sift through documents and attempt to reconstruct the flow of the debtor's assets," *In re Juzwiak*, 89 F.3d 424, 428-29 (7th Cir. 1996) (citations omitted), that is not what happened in this case. Laura's claimed inability to reconstruct Scott's financial affairs or, more precisely, the financial affairs of the entities for which Scott had both ownership and management responsibility, is belied by her access to, and extensive use of, the detailed financial documents stored at the central office building. Even if it took Laura a bit of time and effort to understand what happened, the information was all available to her and she wielded it in

furtherance of her adversary complaint. The question is not whether it was proper for Scott to commingle assets and liabilities between the companies, but whether Laura was reasonably able to understand what happened with his finances and business dealings, and this she was able to do. A debtor is not required to maintain perfect records. *Cf. Johnson v. Bockman*, 282 F.2d 544 (10th Cir. 1960) (impeccable bookkeeping is not required; "[t]he statute is satisfied if the books of accounts or records sufficiently identify the transactions that intelligent inquiry can be made of them.") (citation omitted).

A total bar to discharge is an extreme remedy and bankruptcy courts construe the § 727 denial of discharge provisions liberally in favor of the debtor and strictly against a creditor. *Consumers Oil Co. v. Adeeb (In re Adeeb)*, 787 F.2d 1339 (9th Cir. 1986). Here, Laura was able to identify the questionable transactions with relative ease and Scott's record keeping was appropriate under the facts and circumstances of the case. Even assuming that Scott is personally responsible for maintaining the records of the various entities which he managed, Laura has not sustained her burden of proof that Scott failed to keep or preserve document, records or papers from which his financial condition or business transactions might be ascertained. Accordingly, Laura's § 727(a)(3) claim against Scott is DISMISSED.

**4. Conclusion**

The Court sympathizes with Laura Huntington. As she stated at trial, she is "the last woman standing" and, for the most part, a bystander to Scott and Doug Huntington's poor business practices – poor practices compounded by the sharp decline in the real estate economy upon which the Huntington brothers depended. It is no doubt frustrating for this businesswoman, who has shown herself to be more responsible throughout. But with the one exception noted, she has not shown that her claims are nondischargeable under 11 U.S.C. § 523(a). Nor has she established that Scott and Rochelle are not entitled to a discharge under 11 U.S.C. § 727.

/// End of Opinion ///